1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  RANDALL E. ELLIS,                            CASE NO. 1:02-cv-05646-AWI-SMS PC

10            Plaintiff,                        FINDINGS AND RECOMMENDATIONS
                                                RECOMMENDING MOTION FOR
11      v.                                      SUMMARY JUDGMENT FILED BY
                                                DEFENDANTS BE GRANTED and TO DENY
12  STEVEN CAMBRA, et al.,                      PLAINTIFF'S MOTION TO STRIKE

13            Defendants.                       (Docs. 93, 160)

14      _____            OBJECTIONS DUE WITHIN THIRTY DAYS

15  _____/

16
17                      **FINDINGS and RECOMMENDATIONS**

18  **I.    Procedural History**

19         Plaintiff Randall E. Ellis ("Plaintiff") is a state prisoner proceeding pro se and in forma

20  pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff filed the Third

21  Amended Complaint on January 5, 2004.  (Doc. 22.)  The Court screened the Third Amended

22  Complaint pursuant to 28 U.S.C. § 1915A and found that it appeared to state cognizable claims

23  for relief under 42 U.S.C. § 1983 against Defendants Cambra, Gomez, Terhune, Drew, Van Zant,

24  Galaza, Meske, Keller, Andrews, and Bendon. (Doc. 23.)  Defendants filed motions to dismiss

25  that were variously granted and denied such that this action is proceeding only on Plaintiff's due

26
27
28

1

1  process, equal protection, and retaliation claims against Defendant Drew[1] (hereinafter

2  "Defendant").  (Docs. 61, 72, 79, 80.)  On November 19, 2007, Defendant filed a motion for

3  summary judgment as to Plaintiff's remaining claims and requested the action be dismissed in its

4  entirety.  (Doc. 93.)  Plaintiff filed a motion for an extension of time to file an opposition on

5  December 19, 2007.  (Doc. 102.)  Subsequently, Plaintiff filed an opposition on January 18,

6  2008, despite and noting that discovery was incomplete.  (Doc. 104.)  For a variety of reasons,

7  Plaintiff was subsequently granted leave to file a supplemental opposition and numerous

8  extensions to do so.  (Docs. 110, 125, 128, 134, 140, 144) with which he complied on July 12,

9  2010 (Doc. 148).[2]  Also subsequent to requesting and receiving various extensions of time,

10  Defendant filed a reply on September 9, 2010.  (Doc. 157.)  On September 30, 2010, Plaintiff

11  filed a motion to strike Defendant's reply.  (Doc. 160.)  These motion are deemed submitted.

12         For the reasons discussed herein below, Defendant is entitled to summary judgment on

13  Plaintiff's claim(s) such that his motion should be granted in its entirety.

14  **II.     <u>Summary Judgment Standard</u>**

15         Summary judgment is appropriate when it is demonstrated that there exists no genuine

16  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

17  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

18              [A]lways bears the initial responsibility of informing the district
               court of the basis for its motion, and identifying those portions of
19              "the pleadings, depositions, answers to interrogatories, and
               admissions on file, together with the affidavits, if any," which it
20              believes demonstrate the absence of a genuine issue of material
               fact.
21
22  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the

23

24         [1] Plaintiff may not now expand the scope of this litigation via deposition testimony or his opposition to
    defendants' motion for summary judgment. *See Gilmore v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir.
    2004).  Thus, any references in Plaintiff's opposition to conspiracies such as "concerted effort" (Doc. 148, Plntf.
25  Dec., ¶ 10), "complicite" [sic] (*id.*, ¶ 28), violations of the First Amendment (*id.*, ¶ 32), or claims other than those
    previously identified as operative in this case are disregarded.

26
         [2] Since Plaintiff's supplemental opposition was filed after discovery was complete and various discovery
27  disputes were resolved it is viewed as the operative document in opposition to the pending motion.

28

burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id*. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

The parties bear the burden of supporting their motions and oppositions with the papers they wish the Court to consider and/or by specifically referencing any other portions of the record they wish the Court to consider. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). The Court will not undertake to mine the record for triable issues of fact.

1 | *Id.*

2 | **III.   Undisputed Facts**

3 |     Plaintiff was provided with the requirements to oppose a motion for summary judgment

4 | on October 20, 2004.  (Doc. 31.)  *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).  Plaintiff

5 | filed a number of  declarations -- his own[3] and that of fellow prisoners -- in opposition to the

6 | pending motion.  Plaintiff also signed the operative pleading under penalty of perjury such that it

7 | is viewed as constituting an opposing affidavit for purposes of the summary judgment rule.

8 | *McElyea v. Babbitt*, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); *Lew v. Kona Hospital*,

9 | 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e).  However, Plaintiff neither filed his own

10 | separate statement of disputed facts, nor admitted/denied the facts set forth by Defendant as

11 | undisputed.  Local Rule 56-260(b).  Therefore, Defendant's Statement of Undisputed Facts is

12 | accepted except where brought into dispute by the declarations Plaintiff submitted in support of

13 | his opposition and the applicable allegations of Third Amended Complaint.

14 |     Plaintiff is a prisoner in the custody of the California Department of Corrections and

15 | Rehabilitation.  (Doc. 93-2, Def. UMF, No. 1.)  At the time of filing the Third Amended

16 | complaint, he was housed in the Security Housing Unit (SHU) at the California State Prison,

17 | Corcoran.  (Doc. 22, 3rd AC, p. 1.)  However, the incident which he complains of occurred at

18 | Pelican Bay State Prison – where he is once again currently housed.

19 |     On January 19, 2000, Defendant was on special assignment with the Law Enforcement

20 | and Investigations Unit (LEIU) to assist in the inactive reviews of inmates' gang status at Pelican

21 | Bay State Prison.  (Doc. 93-2, Def. UMF, No. 2.)[4]  At that time, Defendant was an Assistant

22 | Institutional Gang Investigator ("IGI") at the California Correctional Institution at Tehachapi,

---

[3] Due to clerical error, Plaintiff's declaration was scanned into the Court's docket twice -- *see* Doc. 148, at pp. 16-24, 25-33.  All references to Plaintiff's declaration herein are to the first copy of Plaintiff's declaration, which is found at pp. 16-24 of Doc. 148..

[4] As a matter of background, Plaintiff was validated as an associate of the Black Guerrilla Family (BGF) on may 16, 1990, and assessed a term in the Security Housing Unit ("SHU").  Defendant Drew conducted an investigation to ascertain whether Plaintiff's validation status should continue, or if he had been inactive for the last six years so as to allow him to be released from the SHU to the general prison population.

1  California.  (*Id.*)  Defendant's duties included monitoring, tracking, suppression of, and

2  collecting information on gang activity.  (*Id.*)

3      Prison gangs are considered to be the most disruptive of all prison groups.  (Doc. 93-2,

4  Def. UMF, No. 3, *ref. Madrid v. Gomez*, 889 F.Supp. 1146, 1155 (N.D. Cal. 1995).)  Prison gang

5  activities include extortion, drug-trafficking, and premeditated assaults ranging from unarmed

6  attacks to fatal stabbings.  (*Id.*; *Madrid*, at 1241.)  Because prison gang members must pledge

7  allegiance to the gang for life, a thorough debriefing process is necessary to prove that

8  renunciations of gang membership are genuine.  (*Id.*; *ref. Madrid*, at 1241; Cal. Code Regs. §§

9  3378.1, 3378.2, 3341.5, subd. (c)(4), 3378, subd. (c)(5).)  The Black Guerrilla Family ("BGF")

10  has been designated as a prison gang.  (Doc. 93-2, Def. UMF, No. 4.)  In May 1990, Plaintiff was

11  validated as an associate of the BGF.  (*Id.,* UMF No. 5.)  Gang validations are performed to

12  protect the safety and security of the institution.  (*Id.,* UMF No. 6.)  Prison regulations require

13  that an inmate housed in the SHU as a gang member or associate must remain inactive for at least

14  six years before he can be considered for release to the general population based on inactive

15  status (hereinafter "inactive review").  (*Id.,* UMF No. 7, *ref.* Cal. Code Regs. §§ 3341.5, subd.

16  (c)(5), 3378(e).)  The term "inactive" means that the inmate has not been involved in any form of

17  gang activity for at least six years.  (*Id., ref.* Cal. Code Regs. § 3341.5, subd. (c)(5).)  Under

18  California Code of Regulations, Title 15, § 3378(f)(2), the same procedures relating to the initial

19  validation or rejection of gang members or associates shall be followed when reviewing the

20  possible inactive status of validated inmate.  (Doc. 93-2, Def. UMF, No. 8.)  The source items

21  used to validate Plaintiff's gang status were over six years old and, under California Code of

22  Regulations, Title 15, § 3378 (e), Plaintiff was eligible for an inactive review.  (*Id.*, UMF, No. 9.)

23   A gang "member" is an inmate who has been accepted into membership by the gang, while an

24  "associate" is an inmate who is involved periodically or regularly with members or other

25  associates of the gang.  (*Id.,* UMF No. 11, *ref.* Cal. Code Regs. § 3378, subd. (c)(3)-(4).)  Section

26  3378 concerns critical case information and includes the procedures for validating an inmate as a

27

28

prison gang member or associate.  (*Id.,* UMF No. 11.)  This section provides that the institution's gang coordinator or IGI should verify the identification of an inmate as a gang member or associate with "at least three independent source items in the inmate/parolee's central file."  (*Id.,* UMF No. 11, *ref.* Cal. Code Regs. § 3378, subd. (c)(2).)

In 1999, Plaintiff received notice from the Institution Classification Committee that his inactive gang status would be reviewed.  (*Id.*, UMF, No. 10.)  The notification came through a CDC Form128 general information chrono, which was sent to Plaintiff approximately ninety days before the date of the inactive review in January 2000.  (*Id.*)

Under California Code of Regulations, Title 15, § 3378, the source items used to verify the identification of an inmate as a gang member or associate are based on the following criteria: self admission; tattoos and symbols; written material; photographs; staff information; information from other agencies; association with other gang affiliates; information from informants; prior gang-related crimes; legal documentation; receiving visits from known gang affiliates; communication with other gang affiliates; and information from debriefing reports.  (*Id.*, UMF, No. 12.)  Section 3378 provides that these independent source items "must contain factual information or, if from a confidential source, meet the test of reliability established in section 3321."  (*Id.*, UMF, No. 13, *ref.* Cal. Code Regs. § 3378 subd. (c)(2).)  Identifying an inmate as a gang "associate" requires three or more independent source items of documentation "indicative of association with validated gang members or associates."  (*Id.*, *ref.* Cal. Code Regs. § 3378, subd. (c)(4).)  There need not be any showing of actual gang membership.  (*Id.*, *ref.* Cal. Code Regs. § 3378, subd. (c)(3).)  The regulations require that gang involvement be verified by a thorough investigation by a gang coordinator/investigator, also known as the IGI, or their designee.  (*Id.*, UMF, No. 14, *ref* Cal. Code Regs § 3378, subd. (c).)

The procedure for establishing gang membership or association is referred to as the "validation" process.  (*Id.*, *ref Madrid*, 889 F.Supp. at 1241.)  Whenever a gang investigator obtains evidence that an inmate has associated with other gang affiliates, this fact is noted in the

inmate's central file. (*Id.*, *ref*, Cal. Code Regs. § 3378, subd. (c); *Madrid*, 889 F.Supp at 1242.)
When an IGI believes that there is sufficient documentation to validate an inmate, the IGI
prepares a "validation package" for submission to the Special Service Unit ("SSU") in
Sacramento, California.  (*Id.*, UMF, No. 15, *ref Madrid*, 889 F.Supp. at 1242.)  The inmate is
then brought to the office of the IGI, for an interview and told that he is suspected of gang
affiliation, and provided with a copy of a form summarizing the evidence relied upon. (*Id.*)
When the evidence in the validation package includes information from a confidential informant,
the inmate is provided with a Confidential Information Disclosure Form (CDC 1030) which
briefly summarizes the substance of the accusation, insofar as that can be done without disclosing
the informant's identity.  (*Id.*)  During the interview, the inmate is given an opportunity to
present his views to the IGI and contest his alleged gang affiliation; he is not given an
opportunity to present evidence, examine witnesses, or obtain assistance.  (*Id.*, UMF, No. 16, *ref
Madrid*, 889 F.Supp. at 1242.)  If the IGI decides to pursue the validation after meeting with the
inmate, the IGI submits the validation package to the SSU in Sacramento.  (*Id.*)  If the package
appears to be in order, the SSU will validate the inmate as a gang member or associate. (*Id.*, *ref.
Madrid,* at 1243.)

Defendant reviewed the inactive gang status of Plaintiff on January 19, 2000.  (*Id.*, UMF,
No. 17.)  His assignment was to determine whether Plaintiff maintained any current association
with the BGF prison gang.  (*Id.*)  As part of the inactive review process, Plaintiff was
interviewed.  (*Id.*)  The interview is intended to give the inmate notice of the inactive review and
provide an opportunity to rebut the evidence supporting his prospective determination of active
gang association.  (*Id.*)  The investigation, interview, and additional follow-up investigation, if
any, is documented and also forwarded with the package.  (*Id.*)  The package is then forwarded to
the LEIU for review.  (*Id.*)  A special agent assigned to that institution conducts a review of the
inactive investigation.  (*Id.*)  If the reviewing special agent approves the package, the agent will
determine that the inmate's status as a validated associate of a prison gang remains unchanged,

document the findings in writing, and forward it back to the investigator.  (*Id.*)  A copy is then given to the inmate.  (*Id.*)  If the reviewing agent disagrees, or feels that he needs additional information before he can make a decision, the agent will talk to the investigating officer, or request additional information for clarification.  (*Id.*)  If the agent feels that there is insufficient information to continue to validate an inmate, he will reject the package.  (*Id.*)

On January 19, 2000, Plaintiff's sole contact with Defendant was an interview in connection with the review of Plaintiff's inactive gang status.  (*Id.*, UMF, No. 18.)  On January 19, 2000, Defendant interviewed Plaintiff, took pictures of Plaintiff, and searched Plaintiff's cell.  (*Id.*, UMF, No. 19.)  During the interview, Defendant explained the inactive review process to Plaintiff.  (*Id.*, UMF, No. 20.)  Plaintiff was also told that his inactive status was being reviewed, and as part of the process, he was being interviewed, his central file reviewed, and that a determination of his inactive status would be made on the basis of the file review and cell search.  (*Id.*)  Defendant was the only person to search Plaintiff's cell on January 19, 2000.  (*Id.*, UMF, No. 22.)

On January 19, 2000, Defendant interviewed Plaintiff and then conducted a search of Plaintiff personal property located in his cell and found the following:

(a)     A manila envelope with the name and CDC number of a validated member of the BGF prison gang.  Inside the envelope were two San Francisco Bay View Newspapers belonging to a validated associate of the BGF prison gang.

(b)     A manila envelope with no markings on it was located on the right hand side of the lower bunk, as a person stands from the cell door looking in. Inside the envelope were several pieces of paper containing handwritten statements from Plaintiff. Defendant numbered the pages 1-17, at the top right hand corner of each page.  The first page of the handwritten statement reads; "Current status: Domestic Exile."  At the bottom of the first page reads "December 1989-December 1999."  The information is not verbatim and are excerpts from

the handwritten letter.  On page 2, Plaintiff identifies himself as "Sondai K. Dumisani, pronounced Son-dah-ee."  On Page 6- "I arrived at San Quentin State Prison at the age of 18. Thrown into a bloody race war, where I witnessed brothas being attacked by racist prisoners both white and mexican, at the behest of racist prison administrators.  In this environment, is where I met the Black Guerillas. Black men dedicated not only to carrying the torch for our historical struggles, for land, freedom, and selfdetermination, but also to defending the black prison populace."  Later on page 6- "I learned how to read, write, and study from some of the most politically astute broth as since the late comrade George, who took the time to teach and cultivate my awareness.  I was showed the importance of critical thinking, and the necessity of understanding the political, social, cultural, and economic dynamics of amerikan society, and its social scheme." On Page 8- "I can be reached at; Sondai K. Dumisani, S/N Randall Ellis C68764, D6-111, P.O. Box 7500, Cresent City, Ca., 95532."  "Please send your cards, letters, or any questions you may have to the following NARN Collective Think Tank Coordinators."  There are three other validated members/associates of the BGF prison gang listed at the end of this document.

(*Id.*, UMF, No. 23.)

Plaintiff indicated that he finished writing the biography several months before the cell search in January 2000.  (*Id.*, UMF, No. 24.)  Plaintiff's biography mentions George Jackson, who was the person who founded the BGF.  (*Id.*, UMF, No. 25.)  Plaintiff was found in possession of other inmates property that are validated members and associates of the BGF prison gang. (*Id.*, UMF, No. 26.)  Based on the analysis of the materials found in Plaintiff's cell and the review of his central file, Defendant Drew concluded that these materials were source items indicative to membership in the BGF prison gang. (*Id.*)  The conclusion was supported by a confidential memorandum documenting the items found in Plaintiff's cell, which Defendant

wrote on January 24, 2000.  (*Id.*)  All items were copied and sent as an inactive gang status

package to the Law Enforcement and Investigations Unit (LEIU) in Sacramento.  (*Id.*)

Based on these materials, Defendant recommended that Plaintiff's validation status as a

gang associate not be changed.  Defendant did not rely on confidential informants.  (*Id.*, UMF,

No. 27.)  The only information Defendant relied upon in making his recommendations were the

materials found in Plaintiff's cell and the review of Plaintiff's central file.  (*Id.*)  Plaintiff retained

possession of these documents.  (*Id.*)

Plaintiff was given a copy of CDC Form 128-B dated January 24, 2000, which informed

him of the results of the review and the basis for the recommendation that his status as a

validated associate of the BGF was unchanged.  (*Id.*, UMF, No. 28.)

Ronnie Dewberry was Plaintiff's cell-mate from 1996 to 1999.  (*Id.*, UMF, No. 29.)

Clyde Jackson was Plaintiff's cell-mate in 2000 at Pelican Bay State Prison.  (*Id.*, UMF, No. 30.)

The SHU is a housing complex separated from the general prison population.  (*Id.*, UMF,

No. 31, *ref.* Cal. Code Regs. §§ 3341.5, subd. (c), 3343 [describing conditions of segregated

housing]; *see also Madrid*, 899 F.Supp. at 1155.)  Assignment to the SHU is not based on the

inmate's underlying offense; instead the SHU is an administrative means of managing inmates

who commit serious disciplinary infractions once in prison, or who become affiliated with a

prison gang.  (*Id.*, *ref.* Cal. Code Regs. § 3341.5, subd. (c); *Madrid*, 889 F.Supp. at 1155.) The

SHU provides secure housing for inmates whose conduct endangers the safety of others or the

security of the institution. (*Id.*)

Plaintiff claims that these actions by Defendant violated his rights under both the Due

Process and Equal Protection Clause and amounted to unconstitutional retaliation against

Plaintiff in violation of the First Amendment.  (Doc. 22, pp. 16-20.)

## IV.   <u>Qualified Immunity</u>

Government officials enjoy qualified immunity from civil damages unless their conduct

violates "clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v.Katz*, 533 U.S. 194, 200 (2001), *quoting Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), overruled on other grounds by *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 818 (2009)).  In applying the two-part qualified immunity analysis, it must be determined whether, "taken in the light most favorable to [Plaintiff], Defendants' conduct amounted to a constitutional violation, and . . . whether or not the right was clearly established at the time of the violation." *McSherry v.City of Long Beach*, 560 F.3d 1125, 1129-30 (9th Cir. 2009).  The second prong asks whether the right was clearly established such that a reasonable officer in those circumstances would have thought her or his conduct violated the alleged right.  *Saucier*, 533 U.S. at 201; *Inouye v. Kemna* 504 F.3d 705, 712 n.6 (9th Cir. 2007).  These prongs need not be addressed by the Court in any particular order.  *Pearson*, 129 S.Ct. at 818.  "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010) *ref. Saucier*, 533 U.S. at 201-02.

Defendant Drew is entitled to qualified immunity so long as his actions did not violate Plaintiff's clearly established rights to due process, equal protection, and to be free from unconstitutional retaliation.  *Norwood*, 591 F.3d at 1068, *ref. Saucier*, 533 U.S. at 201-02.  "The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Id.*, *ref. Saucier*, 533 U.S. at 202 (emphasis added in *Norwood*).

Defendant Drew argues that he is entitled to qualified immunity because Plaintiff cannot show that Defendant Drew violated his constitutional rights, and that, if the second step of the inquiry is conducted, "in light of the threat to prison security posed by gangs, a reasonable correctional gang investigator such as [Defendant] Drew would have believed his conduct in segregating and validating [Plaintiff] was lawful."  Doc. 93-2, Def. P&A, 15:1-5.)

As discussed in detail herein below, this argument has merit since the law as to what, if

any due process Plaintiff was entitled to on inactive review in January of 2000 was unclear such that a reasonable correctional gang investigator would have believed his conduct did not violate Plaintiff's due process rights.  However, the law as to Plaintiff's rights under the Equal Protection Clause and to be free for retaliation in violation of the First Amendment were clearly established in January of 2000 such that Defendant Drew is not entitled to qualified immunity on those claims.  However, for substantive reasons also discussed herein below, Defendant Drew is entitled to summary judgment on Plaintiff's claims under the Equal Protection Clause and the First Amendment.

### A.     Plaintiff's Due Process Claim

At issue in this action is what, if any, due process was Plaintiff entitled to at his inactive review which resulted in his continued validation as a BGF associate and assessment of an additional six year SHU term.  To properly evaluate Defendant Drew's entitlement to qualified immunity on this claim, one must assess the state of the relevant law leading up to and at the time of the incident in question -- prior to and including January of 2000.  One must also keep in mind that the incident about which Plaintiff complains his rights to due process were violated was not his initial placement in the SHU but rather his six year inactive review.

In the 1980's and 1990's, following an inmate's initial placement in administrative segregation, due process was satisfied if the decision to segregate the inmate was reviewed by prison officials every 120 days, *Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir.1990), cert. denied 502 U.S. 874 (1991); prison officials were only required to engage in some sort of periodic review of an inmate's SHU confinement. *Hewitt*, 459 U.S. 460, 477 n. 9 (1983), *overruled on other grounds Sandin v. Conner*, 515 U.S. 472 (1995); *Toussaint*, 801 F.2d at 1101, *abrogated in part on other grounds by Sandin*; which needed only amount to more than "meaningless gestures," *Toussaint*, 801 F.2d at 1102; and there was no due process requirement that the prisoner even be allowed to submit evidence or make statement(s) at a review hearing, *See Hewitt*, 459 U.S. at 477, n. 9; *Toussaint,* 801 F.2d at 1101.

Further, in 1995, the Supreme Court held that segregated confinement which mirrored the conditions imposed upon inmates in administrative segregation and protective custody did not even present the type of atypical and significant deprivation to equate to a state created liberty interest. *Sandin*, (holding that a convicted inmate who had been placed in disciplinary segregation in a prison's SHU for 30 days had no cognizable procedural due process claim because he had no liberty interest in being free from such confinement).

In 1997, allegations that a Plaintiff was placed in administrative segregation, without more, did not necessarily state a claim for relief based on deprivation of due process under the Fourteenth Amendment. *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (holding that convicted inmate was not "denied due process when he was placed in [a Disciplinary Housing Unit] pending a disciplinary hearing. [The inmate's] due process claim fails because he has no liberty interest in freedom from state action taken within the sentence imposed, and the Ninth Circuit explicitly has found that administrative segregation falls within the terms of confinement ordinarily contemplated by a sentence.") (citation and internal quotation marks omitted).

In 2000, unless there was a clear showing of an atypical and significant hardship, a prisoner's placement and retention in the SHU were "within the range of confinement to be normally expected" by prison inmates "in relation to the ordinary incidents of prison life" which did not rise to the level of deprivation of a liberty interest in being free from administrative confinement in the SHU pending disciplinary hearing. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000), *quoting Sandin*, 515 U.S. at 486-87.

It was not until 2003 that the Ninth Circuit specifically addressed California's policy regarding validating, assigning, and confining suspected gang affiliates to the SHU and found that it was not a disciplinary measure, but an administrative strategy designed to preserve order in the prison and protect the safety of all inmates, though six year inactive reviews were not addressed. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) citing *Toussaint*, 801 F.2d at 1100-01 (holding that when prison officials initially determine whether a prisoner is to be segregated

for administrative reasons, due process only requires the following procedures: an informal non-adversary hearing within a reasonable time after the prisoner is segregated; the prisoner must be informed of the charges against him or the reasons for considering segregation; and, the prisoner must be allowed to present his views) *abrogated in part on other grounds by Sandin*.

In fact, it was not until 2005 that the Supreme Court held that an indefinite placement in Ohio's "supermax" facility, where inmates are not eligible for parole consideration, imposed an "atypical and significant hardship within the correctional context." *Wilkinson v. Austin*, 545 U.S. 209, 223-25 (2005). Though not specifically addressed by either the Supreme Court or the Ninth Circuit, it is only just recently that District Courts in the Northern Division of this state have inferred via *Wilkinson's* rationale, that because indefinite placement in California's SHU may render inmates ineligible for parole consideration, California prisoners may have a liberty interest in not being placed indefinitely in the SHU which appears to entitle them to *Bruce's* minimal procedural protections upon initial validation and also in subsequent inactive reviews. *Ashker v. Schwarzenegger*, No. C 05-03286 CW, 2009 WL 801557, at *17-18 (N.D. Cal. 2009) (addressing evidence used in the six year review); *Garcia v. Stewart*, No. C 06-6735 MMC (PR), 2009 WL 688887, at *13 (N.D. Cal. 2009) (summary judgment granted as inactive review complied with due process such that any procedural deprivation plaintiff might have suffered by virtue of the delayed 2004 inactive review was corrected); *Garcia v. Kirkland*, No. C 05-0341 MMC, 2005 WL 1656904, at *2-3 (N.D. Cal. 2005) (at screening, prisoner was found to state a claim attacking the sufficiency of the evidence used to continue his SHU retention at his inactive reviews).

Thus, the legal status of an inmate's right to due process protections before placement in administrative segregation and in subsequent reviews of that placement have been evolving from the late 1980's to the early 2000's such that there was no clearly established law as to the level of procedural due process Plaintiff would have been entitled to during his inactive review in January 2000. In fact, while it now appears that an inactive review should receive the same due

process protections as an initial validation proceeding, even during the pendency of this action this area of law was amorphous enough that the applicable law appeared to this Court to equate an inactive review to a mere periodic review for due process issues, or at the very most fewer procedural protections than were required for his initial validation.  (Doc. 108, Ord. Re In Camera Rev., 5:1-6.)  Accordingly, even taken in the light most favorable to Plaintiff, it cannot be said that, in January of 2000, he had a clearly established right to due process during Defendant Drew's inactive review such that it would not have been clear to a reasonable officer whether Defendant Drew's conduct was unlawful in the circumstances surrounding Plaintiff's due process rights in the inactive review process.

Defendant is entitled to qualified immunity on Plaintiff's claim(s) that Defendant violated his rights to due process.

## V. **Plaintiff's Equal Protection Claim**

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985), citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  "'To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001), quoting *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  "Intentional discrimination means that a defendant acted at least in part because of a plaintiff's protected status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003), quoting *Maynard v. City of San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994) (emphasis in original).  Prisoners are protected from racial discrimination by the Equal Protection Clause. *Walker v. Gomez*, 370 F.3d 969, 973 (2004).  "To avoid summary judgment, [Plaintiff] 'must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that [Defendant's] decision was racially motivated.'" *Serrano*, 345 F.3d at 1082, quoting *Bingham v. City of Manhattan*

1   *Beach*, 329 F.3d 723, 732 (9th Cir. 2003) (citations and alterations omitted).  Although the Equal

2   Protection Clause ensures similarly situated persons are treated alike, it does not ensure absolute

3   equality.  *Bruce*, 351 F.3d at 1288; *ref. U.S. v. Devlin*, 13 F.3d 1361, 1363 (9th Cir.1994), citing

4   *Ross v. Moffitt*, 417 U.S. 600, 609, 612 (1974).

5          Defendant Drew submits evidence to show that Plaintiff has no proof supporting his

6   Equal Protection Claim other than his belief that he was treated differently (Doc. 93-2, Def.

7   UMF. No. 35) as well as Plaintiff feeling the evidence used against him in his inactive review

8   was insufficient such that so Defendant Drew must have reached his conclusions because he

9   found the materials taken from Plaintiff's cell to be offensive (Doc. 93-3, Exh. A, Plntf. Depo.,

10  46:13-25 & 47:11-17).  Plaintiff has no proof that Defendant Drew actually found the materials

11  in Plaintiff's cell offensive (Doc. 93-2, Def. UMF. No. 34).  Because Plaintiff believed that the

12  materials were insufficient indicators of gang association, Plaintiff felt that the only reason for

13  Defendant to find that Plaintiff was a gang associate was because Defendant must have felt they

14  were offensive.  (*Id.*)  Plaintiff also believed Defendant Drew treated Plaintiff differently merely

15  because he used newspapers as a source in Plaintiff's inactive review.  (*Id.*, Exh. A., Plntf. Depo.,

16  55:2-56:3.)  However, via his declaration, Defendant Drew submitted evidence that he

17  conformed to standardized parameters -- which are used for both validating gang members and

18  inactive reviews -- when he conducted Plaintiff's inactive review.  (Doc. 93-3, Drew Decl., ¶¶ 4-

19  20.)  Defendant Drew delineated that Plaintiff's autobiography was indicative of Plaintiff's

20  continued activity in the BGF since it states that he was "thrown into a bloody race war" when he

21  entered San Quentin State Prison and that he saw "Afrikan-Amerikan" inmates being attacked.

22  Further, he met the BGF and George Jackson (the founder of the BGF) who carry the "torch for

23  our historic struggles, for land, freedom, and self-determination, but also to defending the black

24  prison populace" and of whom he speaks with admiration and credits for teaching him to read,

25  write, study, think critically, the necessity of understanding the political, social, cultural, and

26  economic dynamics of amerikan [sic] society and social scheme, and that Plaintiff's

27

28

1  autobiography ended by listing Plaintiff and three other validated BGF inmates.  (*Id.* ¶17(b).)

2      Even in the original validation proceeding, which is not in issue in this case, Plaintiff was

3  only entitled to the "some evidence" standard of *Superintendent v. Hill*, 472 U.S. 445, 455

4  (1985).  The "some evidence"standard is only "minimally stringent." *Cato v. Rushen*, 824 F.2d

5  703, 705 (9th Cir. 1987).  The relevant inquiry is whether there is any evidence in the record that

6  could support the conclusion reached by the prison decision-makers.  *Id.*  In determining whether

7  there exists some evidence, the Court is not to "examine the entire record, independently assess

8  witness credibility, or reweigh the evidence; rather 'the relevant question is whether there is any

9  evidence in the record that could support the conclusion.'"  *Bruce* at 1287, quoting *Hill*, 472 U.S.

10  at 455-56 (emphasis added).  Although discussed in the context of a disciplinary hearing, the

11  Ninth Circuit has stated that under the *Hill* standard, the evidence should have some indicia of

12  reliability. *Cato*, 824 F.2d at 705.  Under federal law, one piece of evidence may be sufficient to

13  meet the "some evidence" standard. *Bruce*, at 1288.  Satisfaction of the "some evidence"

14  standard does not require that the evidence relied upon "preclude[] any conclusion but the one

15  reached upon by the decision maker." *Hill*, 472 U.S. at 457.  Direct evidence is not required and

16  even evidence best described as meager may be sufficient. *Id.*  The question is whether the

17  record is so devoid of evidence that the finding was without support or otherwise arbitrary. *Id.*

18      Plaintiff's autobiography, which was written just a number of months prior to his inactive

19  review, is sufficient in and of itself to meet the "some evidence" standard of *Hill*.  Plaintiff does

20  not show that autobiographical materials, if in existence and which talk admiringly of a prison

21  gang founder and list the author along with other validated inmates, would be or have been only

22  used against black inmates.  The Court finds that Defendant Drew has met his initial burden of

23  informing the Court of the basis for his motion and identifying those portions of the record

24  believed to demonstrate the absence of a genuine issue of material fact as to Plaintiff's claim

25  under the Equal Protection Clause.  The burden therefore shifts to Plaintiff to establish that a

26  genuine issue as to any material fact actually does exist. *See Matsushita*, 475 U.S. at 586.  As

27

28

1   stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely

2   upon the mere allegations or denials of his pleadings, but is required to tender evidence of

3   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

4   contention that the dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First*

5   *Nat'l Bank*, 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

6       Plaintiff argues that in the inactive review process, Defendant Drew used materials

7   against him that are never used in reviews to retain a prisoner in the SHU.  (Doc. 148, Supp.

8   Opp., ¶24.)  Plaintiff submitted a declaration signed by himself, four Mexican inmates, and two

9   Caucasian inmates -- all housed in the Pelican Bay SHU -- stating "that prisoners of many

10  different races and ethnic backgrounds routinely share books, newspapers and magazines with

11  each other, and such have never been written up or construed even in the remotest way as some

12  form of gang activity and/or association" and that "never in [their] SHU confinement ha[ve their]

13  possession of newspapers, books or magazines belonging to other prisoners ever been considered

14  gang activity or association."  (Doc. 148, Exh. E., p. 78.)  While this declaration may show that

15  Pelican Bay SHU inmates regularly share books, newspapers, and/or magazines and that these

16  seven inmates have never had any such materials used against them in inactive review

17  proceedings, it does not contain any foundational statements to show how the experiences of

18  seven inmates equate to the regular practice and statements of policy for prison staff conducting

19  an inmate's inactive review.  Since lacking foundation, this declaration is not admissible to prove

20  Plaintiff's Equal Protection claim.

21      Plaintiff states in his declaration that he was transferred to the SHU at Corcoran on

22  August 16, 2000, due to a "lack of documentation for gang participation and positive behavior,"

23  which Plaintiff argues shows that Defendant Drew's review was tainted to silence Plaintiff and

24  other black prisoners.  (Doc. 148, Plntf. Dec., ¶ 30.)  Plaintiff's transfer to a different facility

25  because of lack of documentation and positive behavior do not establish that Defendant Drew

26  recommended Plaintiff not be found inactive out of racial bias.  It is also noteworthy that Plaintiff

27

28

was transferred for housing in the SHU and not the general population at Corcoran.  Plaintiff

further declares that "the evidence shows" that Defendant Drew and the gang unit were

motivated by race and that they chose to use the gang validation procedure to silence prisoners

from communicating with the public.  (Doc. 148, Plntf. Dec., ¶ 36.)  However, Plaintiff does not

refer to any specific evidence showing this.

Plaintiff also submitted an affidavit of Clyde Jackson who was Plaintiff's cell-mate on

January 19, 2000 when Defendant Drew came and searched their cell as part of Plaintiff's

inactive review.  (Doc. 148, Jackson Decl., ¶ 2.)  Mr. Jackson was placed in a holding cell while

Plaintiff was interviewed and their cell was searched such that he saw and heard Defendant Drew

discuss the documents with Lieutenant Wise who called the documents "racially tainted crap"

and "Black crap."  (*Id.*, ¶¶ 2-5.)  Mr. Jackson saw Defendant Drew exit their cell holding some

pamphlets, then tell Plaintiff that he was going to make some copies of the documents which he

would return, calling the documents "crap," and advising that Defendant Drew and the

Lieutenant believed the documents were racially tainted and would be looked into further.  (*Id.*,

¶¶ 6-7.)  Mr. Jackson heard Plaintiff respond that the documents represented Black

history/culture to which Defendant Drew responded that it appeared to be racially tainted and that

Plaintiff did not have any business reading or writing it.  (*Id.*, ¶ 8.)[5]  While Mr. Jackson's

declaration shows that Defendant Drew believed the documents removed from the cell he shared

with Plaintiff were racially tainted, it does not show that Defendant Drew was biased against

Plaintiff because of Plaintiff's race when he recommended Plaintiff not be found inactive and

released to the general population.  Plaintiff also does not show that Defendant Drew was

personally offended by his autobiography, or any of the other documents found in his cell, such

that Defendant Drew's recommendation was motivated by Plaintiff's race, as opposed to

---

[5]  Mr. Jackson also states that, on January 19, 2000, other prison staff removed a letter which was to be
mailed out of the facility, but documented it as incoming mail.  (*Id.*, ¶¶ 6-7.)  This and other allegations
are mentioned in Mr. Jackson's declaration and various of the other inmate declarations which Plaintiff submitted,
however, all such assertions are disregarded since they involve prison staff other than Defendant Drew and are not
relevant to the three claims which remain in this action.

Plaintiff's continued admiration for an/or contact with the BGF, its founder, and his contacts with other validated BGF members.

To prove a violation of his rights under the Equal Protection, Plaintiff must submit actual evidence that shows Defendant Drew's actions were motivated by racial bias. *Serrano*, 345 F.3d at 1082. None of the evidence submitted by Plaintiff shows that Defendant Drew's actions were motivated by racial bias. Plaintiff has not established a triable issue of fact to show that Defendant Drew was racially motivated when he recommended Plaintiff not be found inactive. Accordingly, Defendant Drew is entitled to summary judgment on Plaintiff's Equal Protection claim.

**VI.    Retaliation for Conduct Protected by the First Amendment**

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). Adverse action is action that "would chill a person of ordinary firmness" from engaging in that activity. *Pinard v. Clatskanie School Dist.*, 467 F.3d 755, 770 (9th Cir. 2006); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000); *see also Lewis v. Jacks*, 486 F.3d 1025 (8th Cir. 2007); *Thomas v. Eby*, 481 F.3d 434, 440 (6th Cir. 2007); *Bennett v. Hendrix*, 423 F.3d 1247, 1250-51 (11th Cir. 2005); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005); *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

In this case, Plaintiff neither argues nor submits any evidence to show, that Defendant Drew retaliated against him for filing prison grievances or for filing actions in a court of law as would suffice for the element of engaging in protected activity. *See Bruce*, 351 F.3d at 1288. Rather, it appears as though Plaintiff's retaliation claim is based on Defendant Drew utilizing

Plaintiff's autobiography (a form of free speech) as a source against Plaintiff in the inactive review.

This claim raises the question as to whether "the type of activity [Plaintiff was] engaged in was protected under the First Amendment," *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985), and whether "the retaliatory action [] advance[s] legitimate penological goals, such as preserving institutional order and discipline." *Bruce*, 351 F.3d at 1288; *ref. Barnett*, 31 F.3d at 816, *citing Rizzo*, 778 F.2d at 532.

Plaintiff has a recognized right to associate and to engage in protected First Amendment activities such as speech and assembly. *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). "In seeking a 'mutual accommodation between institutional needs and objectives (of prisons) and the provisions of the Constitution that are of general application,' the Court has repeatedly recognized the need for major restrictions on a prisoner's rights. These restrictions have applied as well where First Amendment values were implicated." *Jones v. North Carolina Prisoners' Labor Union, Inc*. 433 U.S. 119, 129-30 (1977) (citations omitted). Further, in a prison context, an inmate does not retain those First Amendment rights that are "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). The Court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt*, 65 F.3d at 807, quoting *Sandin*, 515 U.S. at 482.

Assuming that Plaintiff has a First Amendment right to write and keep his thoughts and autobiography as a form of free speech, the question becomes whether there were any legitimate penological reasons for Defendant Drew to have used Plaintiff's autobiography and the

1    newspaper articles of other inmates as sources in Plaintiff's inactive review.

2         Identifying and segregating gang members and/or associates from inmates in the general

3    population is an administrative action which is performed to preserve order in the prison and

4    protect the safety of all inmates. *Bruce*, 351 F.3d at 1287. "[P]romot[ing] internal security, is

5    perhaps the most legitimate of penological goals," *Overton v. Bazzetta*, 539 U.S. 126, 133

6    (2003); *ref e.g., Pell*, 417 U.S. at 823. Defendant Drew submitted evidence that in January 19,

7    2000, he was on special assignment to assist in the inactive reviews of inmates' gang status at

8    Pelican Bay State Prison, and his duties included monitoring, tracking, and collecting

9    information on gang activity and the suppression of gang activity. (Doc. 93-3, Drew Decl., ¶ 2.)

10   Defendant Drew's declaration showed that his actions in regard to Plaintiff's inactive review

11   were aimed at investigating whether Plaintiff had been inactive in the BGF so as to recommend

12   his release from the SHU to the general population. (*Id.* ¶¶ 3-20.) Defendant Drew's actions

13   were performed to preserve order in the prison and protect the safety of all inmates by

14   investigating whether Plaintiff should be retained in the SHU or released on inactive status to the

15   general population. This is a legitimate penological goal to justify Defendant Drew utilizing

16   Plaintiff's autobiography and newspapers as sources upon which to recommend he be denied

17   inactive status. Further, Defendant submits evidence to show that, in his deposition, Plaintiff

18   testified that Defendant Drew did not retaliate against him, does not believe that Defendant Drew

19   had any retaliatory motives, and has no proof Defendant Drew intended to retaliate against him.

20   (Doc. 93-2, Def. UMF. No. 33.)

21        Accordingly, the Court finds that Defendant met his initial burden of informing the Court

22   of the basis for his motion and identifying those portions of the record which he believes

23   demonstrate the absence of a genuine issue of material fact for summary judgment on Plaintiff's

24   retaliation claim. The burden therefore shifts to Plaintiff to establish that a genuine issue as to

25   any material fact actually does exist. *See Matsushita*, 475 U.S. at 586. As stated above, in

26   attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere

27

28

allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank*, 391 U.S. at 289; *Strong*, 474 F.2d 749.

The only evidence Plaintiff submits in support of his retaliation claim is a statement in his own declaration that he was transferred to the SHU at Corcoran on August 16, 2000, due to a "lack of documentation for gang participation and positive behavior," which Plaintiff argues shows that Defendant Drew's review was tainted and shows that he retaliated against Plaintiff and other black prisoners to silence them.  (Doc. 148, Plntf. Dec., ¶ 30.)  Plaintiff's declaration statements do not override the statements he made in his deposition as "[a] party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts."  *Block v. City of Los Angeles*, 253 F.3d 410, 419, n. 2, (9th Cir. 2001) *ref. Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir.1975).  Even if the statements Plaintiff made in his declaration were considered, they do not demonstrate "that there were no legitimate correctional purposes motivating the actions [by Defendant Drew that] he complains of."  *Pratt*, 65 F.3d at 808.

Accordingly, Plaintiff did not meet his burden such that Defendant Drew is entitled to summary judgment on Plaintiff's retaliation claim.

**VII.    Plaintiff's Motion to Strike**

On September 30, 2010, Plaintiff filed a motion to strike Defendants' reply to Plaintiff's supplemental opposition to the motion for summary judgment under Federal Rule of Civil Procedure 12(f) and Local Rule 78-230(m) – arguing that it is "insufficient, redundant, immaterial, impertinent, and scandalous."  (Doc. 160, p. 1.)

Rule 12(f) provides, in pertinent part, that "[u]pon motion . . . or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant , immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "[O]nly

pleadings are subject to motions to strike." *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  A motion for summary judgment is not a pleading.  Fed. R. Civ. P. 8. Plaintiff also states that his motion to strike is based on Local Rule 78-230, though no such local rule currently exists.  However, Local Rule 230 provides that any party filing a motion may, within seven (7) days after an opposition, file a reply thereto.  Defendant's reply, which Plaintiff seeks to strike, complies with Local Rule 230.

Accordingly, the Court recommends that Plaintiff's Rule 12(f) motion to strike be denied.

**VIII.   Conclusion and Recommendation**

Accordingly, this Court finds that Defendant Drew's motion for summary judgment should be granted in its entirety as he is entitled to qualified immunity on Plaintiff's claim for violation of his rights to due process, and that he is entitled to summary judgment on Plaintiff's claims for violations of his rights under the Equal Protection Clause and for subjecting him to retaliation for engaging in protected conduct.

As set forth herein, the Court HEREBY RECOMMENDS:

(1)   that Defendant Drew is entitled to qualified immunity on Plaintiff's claims under the Due Process Clause, such that his motion for summary judgment, filed on November 19, 2007 (Doc. 93), thereon should be GRANTED;

(2)   Defendant Drew is entitled to summary judgment on Plaintiff's claims under the Equal Protection Clause and under the First Amendment for retaliation based on his protected conduct, such that his motion for summary judgment, filed on November 19, 2007 (Doc. 93), thereon should be GRANTED;

(3)   that Plaintiff's motion to strike Defendant's reply under Federal Rule of Civil Procedure 12(f) be DENIED;

(4)   that the Clerk of the Court be directed to enter judgment for the Defendant Drew and against Plaintiff; and

(5)   that the Clerk of the Court be directed to close the case.

1     These Findings and Recommendations will be submitted to the United States District

2 Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

3 **thirty (30) days** after being served with these Findings and Recommendations, the parties may

4 file written objections with the Court.  The document should be captioned "Objections to

5 Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file

6 objections within the specified time may waive the right to appeal the District Court's order.

7 *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

8

9 IT IS SO ORDERED.

10 **Dated:     October 18, 2010               /s/ Sandra M. Snyder**
                                       UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28